IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

CATHERINE A. MATHEWS,

                          Plaintiff,                          OPINION AND ORDER

           v.
                                                              18-cv-046-wmc

THE NORTHWESTERN MUTUAL
LIFE INSURANCE COMPANY,

                          Defendant.

Plaintiff Catherine A. Mathews claims that The Northwestern Mutual Life
Insurance Company denied her request for short-term disability insurance benefits in
violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C.
§ 1001 et seq.  Pending before the court are the parties cross-motions for judgment as a
matter of law.[1]  For the reasons that follow, the court finds that defendant wrongfully
denied her claim for short-term disability insurance benefits.  Accordingly, the court will
grant plaintiff's motion and enter judgment in her favor pursuant to ERISA § 502(a)(3).


UNDISPUTED FACTS[2]


**A. Overview**

Mathews was a participant in short-term and long-term disability plans issued by

---

[1] Specifically, plaintiff moves for summary judgment under Federal Rule of Civil Procedure 56 (dkt.
#16) and defendant moves for judgment on the administrative record under Federal Rule of Civil
Procedure 52(a) or, in the alternative, for summary judgment under Rule 56 (dkt. #19).

[2] In responding to plaintiff's proposed findings of facts, defendant consistently failed to follow this
court's summary judgment's procedures, which provide:

> When a responding party disputes a proposed finding of fact, the
> response must be limited to those facts necessary to raise a dispute.

Northwestern Mutual to its policyholder, Aztalan Engineering, Inc., Mathews' former employer, referred to by Northwestern as the "STD" and "LTD" Plans. Both are employee welfare benefits plants subject to ERISA, and Northwestern Mutual is also the claims administrator contracted by Aztalan Engineering to administer claims for benefits arising under the plans.

Mathews is 55 years old. In addition to earning her high school diploma, she also completed a Certified Nursing Assistant program. In 1997, Mathews began working at Aztalan Engineering, a manufacturing company, and at least by April 2015, she was working as a Packager & Administrator. According to Aztalan's job description for a Packager & Administrator, the material duties included "cleaning and packaging parts, inspecting parts, and performing assembly operations," and the job required "the ability to occasionally lift up to 50 pounds." (Pl.'s PFOFs (dkt. #17) ¶ 14.) Northwestern Mutual does not dispute that this accurately reflects the duties of a Packager & Administrator, but contends that "from May 4, 2015, until she ceased work more than a year later," Mathews was performing the work of a Finishing Inspector, a light strength level occupation.

---

The court will disregard any new facts that are not directly responsive to the proposed fact. If a responding party believes that more facts are necessary to tell its story, it should include them in its own proposed facts, as discussed in II.B.

(Prelim. Pretrial Conf. Order Attachments (dkt. #11) 5.) The majority of defendant's responses extended well beyond plaintiff's proposed facts, making it substantially more difficult to discern the areas of agreement and material dispute from the parties' submissions. In the future, defendant's counsel should pay closer attention to the court's guidelines. With that said, the court finds the following material facts to be undisputed unless otherwise noted.

Mathews was employed at Aztalan until she was terminated on June 24, 2016, because she maintains, her "myofascial pain syndrome, chronic fatigue, and chronic neck, right arm, and low back pain" precluded her from working. (*Id.* ¶ 13.) Northwestern Mutual disputes that she suffered from fatigue, and it also disputes that Mathews' other medical conditions precluded her from working.

## B. Plaintiff's Job Duties and Accommodations

In 1997, Mathews was injured at work when an object struck her right hip. Mathews contends that this injury subsequently caused chronic low back pain. In 2002, Mathews suffered another accident at work. In a 2014 medical record, Mathews reported that the second accident occurred as "she was loading baskets with some metal parts, and accidentally hurt her right arm and shoulder." (AR 258; *see also* AR 371 (another medical record noted "[s]econd accident occurred 2001/2002 when pt was lifting; resulting in R neck and shoulder pain").)[3] Medication helped Mathews manage the pain from these injuries, and she was able to maintain full-time employment. Also, at some unknown time, she was diagnosed with myofascial pain disorder.[4]

As time went on, however, the lifting requirements of Mathews' job exacerbated her pain, causing it to radiate around her upper abdomen to her belly button. She also

---

[3] The administrative record ("AR") is located at dkt. #14.

[4] "Myofascial pain syndrome is a chronic pain disorder. In this condition, pressure on sensitive points in [a person's] muscles (trigger points) causes pain in the muscle and sometimes in seemingly unrelated parts of [her] body. This is called referred pain." "Myofascial pain syndrome," Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/myofascial-pain-syndrome/symptoms-causes/syc-20375444.

reported being unable (1) to drive to work because of the sedating effects of her medication and (2) to perform the lifting and repetitive tasks required of her job. By 2010, her coworkers also began noticing a decrease in her performance. Northwestern Mutual would dispute both characterizations since medical records from 2015 and 2016, at times, describe her reported pain symptoms as "stable" and "well controlled by medication," indicating generally that there were "no substantial adverse effects related to the medication," and stating specifically that she can drive an automatic vehicle. (Def.'s Resp. to Pl.'s PFOFs (dkt. #25) ¶ 19.)

However, there is no dispute that in early 2015, Mathews sought an accommodation from her employer to perform her work duties, and in response, Aztalan requested that Mathews' doctor complete a "Fitness for Duty" form, which Dr. Milford, Mathews' primary care provider, completed on April 21, 2015. (AR 382-83.) Dr. Milford responded that Mathews is not able to return to work full-time without restrictions, and indicated that she was fully restricted from lifting over 10 pounds and climbing, and had "partial restrictions" for sedentary-lifting 0 to 10 pounds; pulling/pushing, carrying; stopping; kneeling; and operating a motor vehicle, crane, tractor, etc. (indicating that he restricted her driving to "in town only"). (*Id.*)

Based on Dr. Milford's response, Aztalan further determined that she was unable to perform her essential job functions as a Packager & Administrator and transferred her to the position of Material Handler, effective May 4, 2015, although the listed duties for Material Handler are essentially the same as that for Packager & Administrator. Specifically, the Material Handler position's duties included "inspecting parts, cleaning

and packaging parts to specifications, and performing assembly operations," and the position required "standing, walking, bending, crouching, or stopping, and occasionally lifting heavy objected weighing up to 50 pounds." (AR 522.) Defendant does not dispute that she was transferred to this position or that the position involved those duties and required physical demands, but contends that her "actual work duties differed from the duties identified in Aztalan's 'Material Handler' job description." (Def.'s Resp. to Pl.'s PFOFs (dkt. #25) ¶ 22.)

Not surprisingly, given the similarity in the two positions, Mathews was not able to perform the duties of the Material Handler position without accommodations, including the assistance of her coworkers. Northwestern Mutual does not dispute this, but contends that because Mathews was not performing the Material Handler job, Aztalan had effectively created a new position for Mathews by limiting her duties in certain respects and taking some tasks away from other workers in order to form a job for her. Aztalan's HR Manager informed Northwestern that in this position,

> [Mathews] spent time doing hand written inspection reports, and doing data entry after packaging. She would do some packing of small items only, and would clean items that had come back from outside vendors, before packaging them in a particular way as requested by the customer. She did the final inspection of parts before they were packaged and sent to the shipping department.

(AR 522.)

For approximately one year, Mathews worked in this new position, which Aztalan identified as a "Material Handler," but Northwestern claims is more accurately "defined by the STD Plan" as a "Finishing Inspector, a light strength level occupation." During this

year, Mathews contends she continued to struggle with myofascial pain syndrome, fatigue and chronic neck, right upper extremity and low back pain. Northwestern Mutual again disputes the extent of her pain symptoms, pointing to medical records showing that her pain was "stable" and "well controlled," as described in more detail below.

In early 2016, new management took over Aztalan, and in May 2016, Mathews was required to complete an updated Fitness for Duty form. Peter Silvers, PAC, completed that form on June 22, 2016. (AR 158-59.) Consistent with the prior form, Silvers indicated that she was not able to work full-time without restrictions, again limiting her to lifting no more than 10 pounds and stating that this could be on an "infrequent basis if work is within 12 inches of body and below shoulder level," but otherwise, she was limited to 5 pounds on an occasional basis. Silvers also indicated that "pulling" was fully restricted, while "partial restrictions" were necessary for pushing/ carrying, stooping, kneeling, repeated bending and climbing (limiting her to climbing to reach 8-10 feet, but no work at or above shoulder height when climbing).

Because Aztalan was not able to accommodate Mathews' restrictions, it terminated her employment effective June 24, 2016, and encouraged her to apply for disability. Before her termination, Mathews was earning $37,440 annually, or $18.00 per hour.

## C. Plaintiff's Medical History

### 1. Overview

Mathews' diagnosed medical conditions include myofascial pain syndrome,

hyperlipidemia[5] and hypothyroidism. Northwestern Mutual does not dispute this, but contends that there are no identified work-related restrictions with respect to the latter two diagnoses. More specifically, Mathews claims that her myofascial pain syndrome causes fatigue and chronic, neck, right arm and low back pain. As noted above, Northwestern Mutual contends that the medical record does not reflect that Mathews suffered from fatigue and also points to records describing her pain as "stable" and "well controlled." (Def.'s Resp. to Pl.'s PFOFs (dkt. #25) ¶ 36.)

Over the years, Mathews has undergone numerous treatments in an attempt to manage her pain, including physical therapy, acupuncture, injection treatments, transcutaneous electrical nerve stimulation, prolotherapy and pain medication. However, she claims that none of these treatments have provided meaningful relief. Mathews also contends that she suffers from sedating side effects caused by pain medication that she is on, but for support, she points to a medical record from May 2017, almost a year after the end of her employment. Northwestern Mutual also points out that her treatment records from October 6, 2016, December 1, 2016, and January 27, 2017, state that "there are no substantial adverse effects related to the medication." (Def.'s Resp. to Pl.'s PFOFs (dkt. #25) ¶ 38 (citing AR 172, 168, 116).) Nonetheless, Mathews identifies prior complaints by her coworkers that noticed her "doz[ing] off" while on the job and expressed concerns about her safety given that her functions were so impaired. (Pl.'s PFOFs (dkt. #17) ¶ 39.)

---

[5] Hyperlipidemia "covers several disorders that result in extra fats, also known as lipids, in your blood." "Hyperlipidemia," WebMD, https://www.webmd.com/cholesterol-management/hyperlipidemia-overview#1.

### 2. 2013-2015

Mathews walks through her medical records in detail, dating back to early 2013. At that point, Mathews' treating physician Dr. Jeffrey Paterson, D.O., noted she presented with neck and back pain. He also noted that her medication makes her "fuzzy," resulting in errors at work. The medical note further indicated that morphine helped "considerably" with her pain, but that the fentanyl patch "was too much for her and made her dopey." (Pl.'s PFOFs (dkt. #17) ¶ 41 (citing AR 203); Def.'s Resp. to Pl.'s PFOFs (dkt. #25) (citing AR 319, 331).) As a result, Mathews discontinued the fentanyl patch but continued on the morphine.

In 2013, Mathews also was seen by Dr. James Conniff on four occasions to address ongoing pain and fatigue complaints. In his medical notes, Conniff described Mathews' pain as "stable" or "steady," though still recognized that she was suffering from pain, and also noted that her pain was "a little worse recently" or had "worsened." (AR 289, 298, 311.) Mathews continued to see Dr. Conniff in 2014. In an August 14 note, Conniff explained that Mathews was attending physical therapy, though she "doesn't notice any overall improvement." (AR 267.) In a September 16 appointment, Conniff similarly noted "muscle tenderness – cervical and lumbar on deep palpation," and pain with movement of her right shoulder, though Conniff also noted that she was alert and not in acute distress, though "tearful with recall of previous injuries." (AR 372.)

In 2014, Mathews also began treatment with her current, primary care provider, Dr. James A. Milford. In an October 2014 medical note, Dr. Milford noted that Mathews presented with decreased range of motion in her neck, coupled with tenderness and rigidity,

and that she had limited range of motion in her back, back muscle spasms, muscle tenderness and low back pain. Mathews also saw Dr. Anil Dogra in November and December 2014 for pain management. (AR 257, 258.)

On January 26, 2015, Dr. Milford noted that Mathews had seen pain management, apparently in reference to her appointments with Dr. Dogra, who believed that her "current medicines [were] appropriate and should continue." (AR 222.) Dr. Milford also stated that "[w]ithout medication her ADLs [activities of daily living] are impaired." (*Id.*) A few days later, in a January 29 note, Dr. Agril found tenderness in Mathews' low back, but also stated that "[o]verall, [Mathews] thinks that her pain is under good control now" and that she reported her pain level was 5 out of 10. (AR 256.) In an October 12, 2015, medical note, Dr. Milford further wrote that Mathews required transportation to her appointment, that "[p]ain medication is controlling her pain adequately although it's not completed relieved," and that "[s]he is able to perform most ADLs." (AR 350.)

### 3. 2016-2017

On January 14, 2016, Mathews saw a new pain specialist, Dr. Donatello, who noted that Mathews had chronic back pain and had experienced "sudden onset of right arm shoulder and neck pain after engaging in repetitive lifting at work." (AR 253.)[6] Dr. Donatello's physical exam also revealed limited range of motion, and specifically that her "spine range of motion restricted with 0 of extension of cervical segment." (*Id.* at 255.) While Donatello noted that Mathews would continue to treat her symptoms with

---

[6] Defendant maintains that this note is in reference to her injury from 2002, but there is nothing in the note to support this interpretation.

medication, he also "referred her for a cervical spine MRI imaging study given the new cervical symptoms." (*Id.*) A May 10, 2016, MRI further showed "[s]mall C6-7 focal disc in the midline, however no significant central spinal canal stenosis on this study," and "[a] small 3mm nerve root sleeve cyst in the right foramen at C6-7." (AR 136.) Defendant maintains that this MRI was essentially unchanged from a February 2012 MRI, which found "mild midline disk bulge which lateralizes to the right at C6-7, but does not produce any significant encroachment on the spinal cord or the neural foramen." (AR 186.)[7]

At an April 25, 2016, appointment, Dr. Milford similarly noted that:

> Overall her pain condition has been stable. She has ongoing low back pain. Recently however her right upper extremity pain has been increasing. She described pain at the base of her neck and then extending down to her right shoulder and then down her right arm. This does limit her functional ability.

(AR 240.) Milford further noted that Mathews was experiencing "ongoing fatigue which has been getting worse over the past year." (*Id.*) His physical exam also revealed "pain with palpation over her right trapezius," which "seems to stem from the base of her neck." (*Id.*) Accordingly, Milford increased Mathews trazodone prescription and instructed Mathews to continue taking morphine.

Mathews next saw Dr. Milford on July 27, 2016. By this time, Mathews had stopped working, and Milford noted that her pain had improved since then, with Mathews rating her neck and low back pain at 2-3 on a 10-point scale. (AR 341.) Milford also noted that the "MRI scan did not reveal significant pathology except for small cyst." (*Id.*)

---

[7] In 2014, referring to the 2012 MRI, Dr. Milford also noted that the "bulging disc . . was not thought to be the source of symptoms." (Def.'s Add'l PFOFs (dkt. #25) ¶ 8 (citing AR 371).)

Nonetheless, Dr. Milford wanted pain management to address whether the cyst could be contributing to her right upper extremity pain. (AR 343.)

In October 2016, Mathews again saw Dr. Donatello, as well as Kathleen E. Pugh, N.P., to address her ongoing pain, which she rated as a 6 out of 10. At that time, the medical record also noted: (1) a decreased range of motion with the right arm when elevated upward, for which an electromyogram ("EMG") of the right arm was ordered to explore that symptom further, and (2) a decreased range of motion of her neck. (AR 171.) Otherwise, the physical exam demonstrated normal range of motion. (*Id*.) Nurse Pugh also noted that Mathews' "[u]se of the medication allows patient to attend ADL and family activities without absence due to pain," and that there were "no substantial adverse effects related to the medication." (AR 172.)

In a December 2016 appointment with Dr. Donatello, Mathews reported pain in her neck, which radiates to both shoulders, and rated her pain at 5-6 out of 10. The physical exam also revealed swelling and tenderness of the back of the neck and pain when bending head down. (AR 168.) This medical note also mentioned the role of medication in allowing Mathews to attend "work and family activities without absence due to pain." (*Id*.) At the time of this appointment, Mathews had yet not had the EMG, and she was instructed to do so before her next appointment. Mathews saw Nurse Practitioner Pugh again in January 2017, and reported that her pain was 4 out of 10, radiating down both shoulders and down her right arm. Mathews also reported that her "pain interferes with ADLs," but that the "medication was working well" and that she was not experiencing adverse reactions to it. (AR 115.)

11

Other than noting that her hand grips were 4 out of 5, her physical examination was normal. In addition, Nurse Pugh noted that Dr. Milford had completed the EMG. Finally, plaintiff contends that she was diagnosed with "cervical disc disorder with radiculopathy," but fails to direct the court to the results of this test or Milford's diagnosis in the record. (Pl.'s PFOFs (dkt. #17) ¶ 58.)

On May 9, 2017, Mathews had an appointment with Dr. Milford, in which he noted that: she has "been able to decrease the dose of her morphine. Pain has gone from an average level of 9 down to 4. She is able to better function with activities of daily living. She continues to have upper back discomfort." (AR 108.)[8]

### D. Insurance Policy

Defendant Northwestern Mutual issued a short-term disability insurance plan and a long-term disability insurance plan to Aztalan, and Northwestern Mutual is responsible for paying out any benefits provided by these plans. In the short-term disability insurance plan ("STDI Plan" or "Plan"), Northwestern Mutual "agrees to pay the benefits provided by the Policy, in accordance with the provisions of the Policy." (AR 1, 19.) The Plan does *not* grant discretion to Northwestern Mutual to construe the terms of the plan or to determine eligibility for benefits.[9]

---

[8] Plaintiff also submits some evidence of mental health treatment during this period, but that evidence appears limited to providing support for a finding that she suffered from fatigue, rather than as a separate basis for finding her unable to perform the material duties of her job. (*See* Pl.'s PFOFs (dkt. #17) ¶¶ 60-63.)

[9] Plaintiff submits a number of proposed findings about the long-term disability insurance plan ("LTDI Plan"). For the reasons explained below in the opinion, plaintiff's claim does not implicate that plan.

Material to plaintiff's complaint, the STDI Plan provides that Northwestern Mutual will pay STDI benefits when, "as a result of Sickness, Injury, or Pregnancy, you are unable to perform with reasonable continuity the Material Duties of your Own Occupation." (AR 13.) Material Duties is defined as "the essential tasks, functions, and operations, and the skills, abilities, knowledge, training and experience, generally required by employers for those engaged in a particular occupation." (AR 14.) The Policy defines "Own Occupation" as

> any employment, business, trade, professional calling or vocation that involves Material Duties of the same general character as your regular and ordinary employment with your Employer. Your Own Occupation is not limited to your specific job with your Employer or to your specific area of specialization, interest or expertise within the general occupation.

(AR 14.)

The STDI benefit is equal to the maximum benefit minus the plan participant's other income. The maximum benefit is equal to 66 2/3 percent of the plan participant's predisability earnings, not to exceed $2,000. The maximum benefit period is 13 weeks. Had she been approved, Mathews would have earned benefits of $480 per week for 13 weeks, from June 24 through September 24, 2016.

### E. Claim for Benefits and Administrative Appeal of Denial

Mathews submitted her application for STDI benefits to Northwestern Mutual in June 2015. Included with her application was an Employer Statement, identifying her job title as Material Handler and providing the job description of that position. In her application, Mathews stated that her disability prevented her from being able to operate

machinery, thread gage parts, do repetitive motions, lift more than five pounds, reach overhead and push parts on pallets. Mathews also submitted Dr. Milford's July 27, 2016, report, in which he concluded that Mathews was "unable to return to prior employment with or without accommodation." (AR 393.)

Linda Knickrehm, a vocational case manager, reviewed Mathews' claim. Knickrehm concluded that while Mathews' job title was "Material Handler," the actual work performed did not match the material duties of a "Material Handler." Consistent with that view, Aztalan's HR Manager also stated that the position Mathews was performing did not exist as a separate occupation at Aztalan. Knickrehm concluded that, "[a]lthough the above duties do not constitute a position at Aztalan Engineering, this occupation does exist in the general economy under the title of Finishing Inspector, . . . a light level occupation requiring frequent reaching, handling, and fingering." (AR 523.) The physical demands of this position require the ability to exert 20 pounds of force occasional or 10 pounds of force frequently.

Northwestern Mutual also arranged for Dr. Jamie Lewis to conduct a peer review in October 2016, specifically asking her to consider: whether Dr. Milford's April 6, 2016, opinion that Mathews was precluded from work was "reasonable based upon the available medication information"; whether Mathews' medications have been documented to cause "any cognitive or physical limitations"; and when Dr. Lewis would "anticipate a material change in claimant's condition." (AR 211.) Lewis prepared a written report dated October 17, 2016, in which she concluded that Dr. Milford's opinion was

> based on the claimant's complaints rather than the clinically supported findings, especially given the lack of comprehensive

clinical examination or supporting diagnostic studies indicating functional or neurological deficit. Her symptoms are stable and overall mild. It is unclear why the claimant would not have the ability to work.

(AR 205.)

While Dr. Lewis acknowledged that Mathews experienced "pain with palpation over her right trapezius, limited range of motion of the spine with 0 degrees of extension of the cervical segments," and muscle spasms in her back, Lewis also noted that: an "MRI scan did not reveal any significant pathology except for a small cyst"; she was "alert and oriented" during the exam; her "range of motion of the shoulder is okay and does not seem to exacerbate the pain"; there is "no joint welling or tenderness"; and she has "no focal motor deficit or sensory." (AR 205-06.)

From this, Dr. Lewis concluded that "the claimant is not functionally impaired from a Physical Medicine & Rehabilitation/Pain perspective." (AR 206.) Lewis also stated that the "medical evidence does not validate any side effects from the prescribed medications that would impact the claimant's functional capacity." (*Id.*) As for the third identified question -- when a material change on her condition could be anticipated -- Lewis further concluded:

> The claimant reports ongoing fatigue and pain symptoms; however, she most recently only rates her pain at a 2-3. There is no evidence of any neurological features on examination, nor is there significant pathology on diagnostic studies. As her findings are mild in severity[,] I would not expect a material change in condition and the claimant would not have any significant limitations given the documentation provided for review.

(*Id.*)

On November 1, 2016, Northwestern Mutual informed Mathews of its decision that she did not qualify for STDI benefits, concluding that: (1) Mathews' "occupation as a Packaging/Clean Room and Material Handler is consistent with a Finishing Inspector, which is considered Light Strength level work"; and (2) Mathews' "medical conditions would have not prevented [her] from performing a light level occupation as of April 6, 2016, and beyond." (AR 507-09.)

In November 2016, Mathews requested a review of Northwestern Mutual's denial. In support, she submitted updated medical records, including updated records from Dr. Donatello, Nurse Practitioner Pugh and Dr. Milford. Mathews also submitted Dr. Milford's December 15, 2016, Attending Physician Statement, which identified Mathews' primary diagnosis as myofascial pain syndrome, indicated that he recommended she stop working in April 2015, and described various physical restrictions, including lifting and carrying no more than 10 pounds. (AR 111-112.) Dr. Milford concluded by stating, "Patient unable to return to prior employment with or without accommodation. She is totally disabled." (*Id.* at 112.) Mathews also submitted statements from coworkers and supervisors, noting her diminished functionality.

After deferring a review of her appeal at Mathews' request, on May 12, 2017, Northwestern Mutual referred her claim to Dr. Ephraim Brenman for a peer review report. In his report, dated May 22, 2017, Dr. Brenman concluded that:

> the available medical information does not reasonably support Ms. Mathews was impaired from performing light strength level work requiring frequent reaching, handling, fingering and repetitive tasks on a full time basis as of, and continuing after 06/24/16, through the present due to her neck, bilateral/right shoulder, and/or lower back pain complaints.

(AR 69.) Dr. Brenman explained that the examination did not show any "significant defects," noting (1) "no findings of imaging studies on the lumbar spine," and (2) "MRI of the cervical spine only showed a small C6-7 disk protrusion in the midline without any significant stenosis with a small nerve root sleeve cyst." (*Id.*)[10]

In a letter dated August 9, 2017, therefore, Northwestern Mutual affirmed its decision to deny coverage, explaining:

> While we are not denying that you have medical conditions causing chronic pain, for which you have sought ongoing medical care and treatment, and for which you were given several specific diagnoses including myofascial pain syndrome, we do not find the medical information in your file supports those conditions and/or symptoms were of such severity as of June 25, 2016, and continuing beyond, as to have impaired your ability to continue to perform your Own Occupation of Finishing Inspector on a full-time, reasonably continuous basis.

(AR 399.) This lawsuit followed.

OPINION

## I. Standard of Review

Pursuant to 29 U.S.C. § 1132(a)(1)(B), Mathews seeks review of Northwestern Mutual's denial of her short-term disability benefits. "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489

---

[10] Brenman did not believe the protrusion was of any significant concern, which was consistent with Dr. Milford's notation in a September 16, 2014, medical record reviewing the previous imaging study that had found a "bulging disc but this was not thought to be the source of symptoms." (AR 371.)

U.S. 101, 115 (1989).  Northwest Mutual concedes that there is no language in the plan giving it discretionary authority to determine eligibility.  (Def.'s Opp'n (dkt. #20) 14.) Thus, the *de novo* standard applies in this case.

Under the *de novo* standard of review, the court must "mak[e] an independent decision about the employee's entitlement to benefits."  *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007).  Specifically, the court must make its own decisions "on both the legal and factual issues that form the basis of the claim."  *Id.*  "What happened before the Plan administrator or ERISA fiduciary is irrelevant."  *Id.*  Here, the court must determine whether Mathews is entitled to disability insurance benefits, not whether she received a full and fair hearing.  *Id.*

In light of this standard, Northwestern Mutual moves for judgment on the administrative record, urging the court to review this case pursuant to Federal Rule of Civil Procedure 52(a), which allows the court to make factual findings, rather than Rule 56.  *See Pakovich v. Broadspire Servs., Inc.*, 535 F.3d 601, 604 (7th Cir. 2008) (discussing district court's review of ERISA denial of benefits pursuant to Rule 52); *Patton v. MFS/Sun Life Fin. Distributors, Inc.*, 480 F.3d 478, 484 n.3 (7th Cir. 2007) ("Those who wish to ensure that a judgment is treated with the deference due the result of a bench trial are advised to eschew Rule 56 and stick to Rule 52(a).").

## II. Scope of Appeal

In addition to seeking review of Northwestern Mutual's denial of short-term disability insurance benefits, Mathews also seeks review of a claim for long-term disability insurance.  In support, Mathews points to the fact that on November 6, 2017, Mathews

requested both STDI claim and LTDI claim forms in order to file a claim for LTDI benefits. In response, in a letter dated November 20, 2017, Northwestern Mutual informed her that "it did not require a separate application for LTDI claims and that once her STDI benefits were exhausted, a review of her eligibility for LTDI benefits would be completed." (AR 385.) Mathews also points to a passing reference in a claim review note -- "Ms. Mathews has requested a review of the decision to deny her STD claim [which also meant her LTD claim was denied]" -- to support her claim for LTDI benefits before this court. Except to the extent that Northwestern Mutual's denial of her STDI benefits necessarily denied any claim to LTDI benefits, Northwestern Mutual has not reviewed a claim for LTDI benefits and, therefore, neither can this court. *See Pakovich*, 535 F.3d at 607 (adopting rule that "when the plan administrator has not issued a decision on a claim for benefits that is now before the courts, the matter must be sent back to the plan administrator to address the issue in the first instance").

## III. *De Novo* Review of Denial of STDI Benefits

In denying benefits, Northwestern Mutual determined that Mathews was able to "perform the Material Duties of her light level Own Occupation as a Finishing Inspector." (Def.'s Opp'n (dkt. #20) 16.) However, that determination appears to be based on the erroneous premise that her "Own Occupation" was a "Finishing Inspector," as opposed to a "Material Handler." The undisputed record reflects that her employer refused to accommodate her further by providing a modified job with certain restrictions due to her physical limitations. (*See* AR 523 (describing HR employee Cummings statement that after Mathews was transferred to the Material Handler job, "[w]e took some tasks away from

other workers to meet her restrictions"); *id.* at 522 (after receiving the June 22, 2016, fitness for duty certification, Aztalan determined that it was "unable to continue [to] accommodate Ms. Mathews").

At the time of her termination in contrast, Mathews was required to fulfill the original "Material Handler" job to have remained employed, rather than the modified, light-duty job that was no longer available. In other words, in terminating her, Aztalan considered Mathews' "regular and ordinary employment" to be the "regular and ordinary" Material Handler position, not her actual position. As reflected in Dr. Milford's April 2015 Fitness for Duty form and PAC Silvers' June 2016 form, Mathews could not perform that job; ironically enough, her employer agreed with this in terminating her employment and encouraging her to apply for disability. As such, in determining whether she was entitled to short-term disability benefits, Northwestern Mutual should have considered whether she could perform the Material Duties of the regular and ordinary Material Handler job, rather than the modified Material Handler job that was no longer available.

Not only does this conclusion reflect the facts as set forth in the administrative record and the policy language that Northwestern agreed to underwrite and administer faithfully, but any other reading would create a "catch 22" for employees that runs counter to public policy. Indeed, defendant's self-serving interpretation of "Own Occupation" creates fertile ground for corruption. An employer could agree to accommodate an employee on a short-term basis by providing her with a modified, less exacting job; next, the employer could make a determination that it could no longer provide such an accommodation, terminating her employment; then, in determining whether the employee

is entitled to disability benefits, the insurer could rely on the now non-existent, short-term, modified job to deny benefits. Whatever the legality of this arrangement between employer and employee,[11] it is wholly inconsistent with an insurer's obligations to plan beneficiaries under ERISA. *See Hennen v. Metro. Life Ins. Co.*, 904 F.3d 532, 541 (7th Cir. 2018) ("As a fiduciary, MetLife owed Hennen a duty to execute faithfully the terms of the plan and to see that those entitled to benefits receive them." (internal citation and quotation marks omitted)).

Having determined that Northwestern Mutual should have defined Mathews' "Own Occupation" as the Material Handler position, the next question is whether Mathews could fulfill the material duties of that position at the time she was terminated. Ordinarily, that question would be for the defendant to determine after remand for further review under the correct "Own Occupation" definition. In light of the *de novo* review standard applicable here generally *and* Northwestern Mutual's own urging that the court make factual findings on the administrative record under Rule 52(a), the court, instead, will review the record independently and determine whether Mathews has demonstrated by a preponderance of the evidence that she was not capable of performing the material duties of the Material Handler position at the time of her termination. *See Ruttenberg v. U.S. Life Ins. Co. in City of New York, a subsidiary of Am. Gen. Corp.*, 413 F.3d 652, 663 (7th Cir. 2005) (under *de novo* review, a party "seek[ing] to enforce benefits under the policy . . . bears the burden of proving his entitlement to contract benefits").

---

[11] This case only concerns a denial of benefits under ERISA, but the record suggests that Mathews may also have an Americans with Disability Act claim against her employer for failing to accommodate her by maintaining the modified Material Handler position.

As described above, the Material Handler's physical demands included "standing, walking, bending, crouching, or stooping, and occasionally lifting heavy objects weighing up to 50 pounds." (AR 522.)[12] As reflected in the medical record above, plaintiff's chronic pain is well-documented, dating back to the early 2000s, and she has been diagnosed with myofascial pain disorder. The record also reflects that Mathews tried an array of treatments, including physical therapy, acupuncture, injection treatments, transcutaneous electrical stimulation, prolotherapy and pain medication, with none providing meaningful relief, with the exception of pain medication. Moreover, while her treating physicians, including Dr. Milford, noted at times that her pain was "stable" or "steady," these same physicians frequently noted that her pain "was a little worse recently" or had "worsened." (AR 289, 298, 311, 240.)

In contrast, defendant latches onto a single, pain rating of 2-3 on a 10-point scale Mathews gave to Dr. Milford during her July 27, 2016, appointment. (AR 341.) As he noted in that record, however, her pain had improved since she had stopped working *the month before*. Other records also reflect pain ratings of 5 to 9, and in physical examinations, her physicians noted muscle tenderness at palpation, decreased range of motion, swelling and redness.[13]

In late 2015 or early 2016, the record also reflects that Mathews began experiencing right shoulder and neck pain, distinct from her chronic back pain. Dr. Donatello ordered

---

[12] While defendant points out that the average weight was only 5 pounds, there appears to be no dispute that the ability to lift, carry, push or pull 50 pounds *is* also part of the actual job description. (AR 538.)

[13] In fairness, these findings varied and were not even recorded at some of her appointments.

an MRI given these new symptoms, which defendant erroneously characterizes as showed no change from her earlier 2012 MRI. Defendant is correct that the MRI found no change as to the C6-C7 bulging disc, but the May 2016 MRI did show "a small 3mm nerve root sleeve cyst in the right foramen at C6-C7." (AR 136.) In a subsequent visit with Dr. Milford to review the MRI and for further pain treatment, Milford also noted that the cyst could be contributing to her right upper extremity pain. (AR 343.)

Defendant would similarly place much weight on the purported lack of change in MRI results, and the fact that Milford did not believe that the disc bulge was the reason for her symptoms, but fails to develop *any* argument or provide any reason why a lack of an objective finding on an MRI undermines plaintiff's already medically diagnosed myofascial pain disorder. *See Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 919 (7th Cir. 2003) (reversing denial of benefits under arbitrary and capricious standard where defendant insurer relied on lack of objective findings, explaining "[b]ut the gravest problem with Dr. Chou's report is the weight he places on the difference between subjective and objective evidence of pain. Pain often and in the case of fibromyalgia cannot be detected by laboratory tests"); *cf. Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004) ("Pain, fatigue and other subjective, unverifiable complaints are in some cases the only symptoms of a serious medical condition."); *Buehler v. Astrue*, No. 08-CV-732-BBC, 2009 WL 2495749, at *9 (W.D. Wis. Aug. 12, 2009) ("[T]he lack of objective medical findings was not a sufficient reason to reject her subjective symptoms.").

Defendant next makes much of Dr. Donatello's January 14, 2016, note that "the use of medication allows her to remain at full-time employment without significant absence

due to pain symptoms." (AR 253.)  Critically, at the time Donatello made this observation, Mathews was performing the modified job, which defendant determined was a light-duty job.  Dr. Donatello did *not* opine as to whether she would be able to perform the duties of a medium exertion job, like the Material Handler position.

With these stray facts set aside then, defendant principally relied on two consulting physicians in denying Mathews benefits.  In her brief responses to three questions posed by defendant, Dr. Lewis rejected Dr. Milford's opinion that she was restricted in working, finding them "based on the claimant's complaints rather than clinically supported findings." (AR 205.)  As detailed above, the record supported a finding of chronic pain, consistent with her diagnosis of myofascial pain syndrome, including physical examinations by multiple treating physicians during the relevant period of time for short term benefits.  Moreover, Dr. Lewis fails to explain what "diagnostic studies" would be available to either rule out or provide additional support for her diagnosed condition.  Her conclusion that "claimant is not functionally impaired" is not rooted in the medical record. *See Hennen*, 904 F.3d at 540 (finding denial arbitrary and capricious when insurer relied on reviewing physician's opinion that failed to account for medical support of a finding of radiculopathy in the record).

As for Dr. Brenman, he concluded that Mathews is capable of working based solely on his finding that she is capable of "performing *light* strength level work." (AR 69 (emphasis added).)  Brenman did *not* render an opinion as to whether her physical limitations would prevent her from performing medium exertion work, like the Material Handler position.  As such, the court need not place any weight on his report, since it fails

to analyze Mathews' physical abilities for the relevant occupation as defined by the Plan at the time she applied for short term disability benefits.

Recognizing that, at least under the arbitrary and capricious standard of review, the opinions of treating physicians are not entitled to deference, *see Hennen*, 904 F.3d at 540, the court concludes that the medical record supports a finding by the preponderance of the evidence that Mathews' chronic pain, both back and right upper extremity, impeded her physical abilities such that she could not perform the material duties of the actual Material Handler job.[14]  As such, the court concludes that she was entitled to short-term disability for the thirteen-week period following her termination on June 26, 2016.   Having determined that Mathews is entitled to STDI under defendant's plan, Mathews now may apply for LTDI benefits for Northwestern's review in the first instance. [15]

---

[14] While the court finds that plaintiff has demonstrated by a preponderance of the evidence that in June 2016, she was suffering from chronic back and right upper extremity pain to the extent that she was not able to lift 50 pounds or engage in other physical requirements of the Material Handler position, the court's decision does not depend on a finding on this record that the medications that she was on, at least in the months leading up to her termination, impeded her concentration or otherwise impacted her ability to work.  The record suggests that she could not tolerate fentanyl in 2013 (based on her self-report that it made her feel "dopey"), but she ultimately stopped taking that medication and, instead, relied primarily on morphine.  The absence of any conclusion as to medication side effects, however, does not undermine a finding that plaintiff's chronic pain issues limited her ability to lift or carry objects over ten pounds and otherwise restricted her movements.

[15] Plaintiff argues that for the first two years of LTDI benefits, the same "Own Occupation" standard applies.  If her description is accurate, then she may be entitled to benefits for that period, but defendant will need to make that determination in the first instance.

ORDER

IT IS ORDERED that:

1)  Plaintiff Catherine A. Mathews' motion for summary judgment (dkt. #16) is GRANTED IN PART AND DENIED IN PART.  The motion is granted as to her claim for short-term disability insurance benefits, but denied in all other respects without prejudice to seeking LT benefits directly from the Plan.

2)  Defendant The Northwestern Mutual Life Insurance Company is DIRECTED to award plaintiff STDI benefits consistent with the Plan's terms.

3)  Defendant's motion for judgment in the administrative record (dkt. #19) is DENIED.

4)  Plaintiff's motion for hearing (dkt. #29) is DENIED AS MOOT.

5)  The clerk of court is directed to enter judgment in plaintiff's favor, finding defendant violated ERISA in denying plaintiff short-term disability insurance benefits.

Entered this 29th day of October, 2019.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge